**In re: STONE & WEBSTER, INC., SECURITIES LITIGATION**

**No. CIV.A. 00–10874–RCL.**

United States District Court, D. Massachusetts.

March 28, 2003.

Norman Berman, Jeffrey C Block, Alicia M. Duff, Berman DeValerio Pease Tabacco, Burt & Pucillo, Boston, MA, for Adele Brody, Albert A. Blank, David B. Everson, Fanny Mandelbaum, Mark Hanson, SG Cowen Asset Management, Inc., John Grady, Elena Hanley.

Edward J. Barshak, Sugarman, Rogers, Barshak & Cohen, Boston, MA, Jay W. Eisenhofer, Sidney S. Liebesman, Adria Benner, Grant & Eisenhofer, P.A., Wilmingotm, DE, Jay W. Eisenhofer, Sidney S. Liebesman, Adria Benner, Grant & Eisenhofer, P.A. Wilmington, DE, for Ram Trust Services, Inc., Lens Investment Management, LLC.

Steven G. Schulman, Milberg, Weiss Bershad Hynes & Lerach, LLP, New York City, Marc A. Topaz, Schiffrin & Barroway, LLP, Bala Cynwyd, PA, Paul J. Geller, Samuel H. Rudman, Cauley & Geller, LLP, Boca Raton, FL, Stephen Moulton,

Nancy F. Gans, Moulton & Gans, PC, Boston, MA, for Fred DuBois, Jr.

Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, Janet L. Goetz, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC, for Stone & Webster, Inc.

William G. Meserve, Ropes & Gray, Boston, MA, Jordan D. Hershman, Thomas C. Frongillo, Inez H. Friedman–Boyce, Testa, Hurwitz & Thibeault, LLP, Boston, MA, for H. Kerner Smith, Thomas Langford.

Christian M. Hoffman, Peter M. Casey, Jack W. Pirozzolo, Kevin C Conroy, Foley Hoag LLP, Boston, MA, for Pricewaterhousecoopers, LLP.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

LINDSAY, District Judge.

### I. Introduction

This is a consolidated securities fraud class action in which the lead plaintiffs are Ram Trust Services, Inc. and Lens Investment Management, LLC ("the plaintiffs"). The lead plaintiffs propose a class of all purchasers of Stone & Webster, Inc. ("S & W" or the "Company") securities between January 22, 1998, and May 8, 2000.[1] The defendants are S & W; H. Kerner Smith ("Smith"), S & W's former Chief Executive Officer ("CEO"); Thomas Langford ("Langford"), S & W's former Chief Financial Officer ("CFO"); and Pricewaterhousecoopers, LLP ("PwC"), S & W's auditors.

The Consolidated and Amended Class Action Complaint ("Amended Complaint") is in three counts. Count one alleges violations by all the defendants of section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C.

§ 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder by the Securities and Exchange Commission ("SEC"). Count two alleges that Smith and Langford violated section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Count three alleges violations of section 18 of the Exchange Act, 15 U.S.C. § 78r, by all of the defendants.

All proceedings against S & W itself were stayed on July 25, 2000, upon its filing of a suggestion of bankruptcy. The other defendants have filed motions to dismiss the Amended Complaint under Fed. R.Civ.P. 12(b)(6), arguing that the plaintiffs have failed to satisfy the strict pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), Pub L. No. 104–67 (1995) (codified at 15 U.S.C. § 78u–4 & –5), and Fed.R.Civ.P. 9(b). For the reasons stated below, I GRANT these motions in part and DENY them in part.

### II. Factual Allegations

The facts recited here, unless otherwise noted, are drawn from the Amended Complaint.

S & W was founded in 1889 by two graduates of the Massachusetts Institute of Technology. Am. Compl. ¶ 28. Originally an engineering services firm, S & W expanded into a construction, engineering, and consulting firm that executed projects around the world. *Id.* Over the years, it has been a major builder of urban transit systems, public utilities, and nuclear power plants. *Id.* ¶ 29. By the 1990s, however, S & W's business was stagnating: net income, which had been $49 million in 1987, dropped to $1.9 million in 1993. *Id.* ¶ 30.

In February 1996, S & W's then CEO resigned and was replaced by Smith. *Id.* ¶ 31. In June 1997, Langford became an

---

**1.** This period is thus denominated the "Class Period."

Executive Vice President and CFO. *Id.* ¶ 32. By the end of that year, S & W represented that a corporate restructuring program directed by Smith and Langford had turned the Company around, and the Company reported net income of $33.5 million. *Id.* The Company's stock reached $55 per share. *Id.*

The plaintiffs allege, however, that this turn-around and profitability "was a mirage." *Id.* ¶ 33. They allege that: "Smith and Langford had employment contracts providing for lucrative payments should a 'change of control' occur. Therefore, from the outset, their strategy was to make the Company look good in the short-run to position it for a sale." *Id.* To achieve this goal,

> S & W distorted and misrepresented its results throughout the Class Period by failing to book known losses on its income statement, by failing to reduce its net assets to account for its money-losing projects and by booking phantom revenue and receivables from a suspended job, long after there was no hope the job would be revived.

*Id.* ¶ 50.

The plaintiffs allege that Smith and Langford made false and misleading statements about S & W's financial condition in press releases, SEC filings, and other public documents. *Id.* ¶ 20. Moreover, the plaintiffs claim, S & W's auditors, PwC, knew of or recklessly disregarded false statements in S & W's financial statements and issued false or misleading opinions with respect to those financial statements. *Id.* ¶¶ 24–25.

## A. *Allegations Against Smith and Langford*

As noted above, much of S & W's work consisted of large construction projects. Such contracts usually took one of two forms: cost-plus or fixed-price. Am. Compl. ¶ 37. In a cost-plus contract, the contractor is paid its cost to complete the project plus an agreed-upon percentage of the total cost as profit. *Id.* By contrast, in a fixed-price contract, the contractor receives a fixed sum for performing the contract, no matter what the cost eventually proves to be. *Id.* Thus, under a fixed-price contract, as distinguished from a cost-plus contract, the contractor bears the risk of cost overruns on the project. *Id.*

### 1. *The Underbidding Policy*

According to the plaintiffs, Smith and Langford established a policy of "underbidding" on projects in 1997. *Id.* ¶ 52.

> This strategy was an effort to increase the number and dollar magnitude of projects on S & W's books, create the perception of growth in S & W's business and tout an ever-increasing project backlog. Smith and Langford did this even though they knew that S & W's backlog figures would then represent money losing projects.

*Id.* The "backlog" is "the accumulated amount of the Company's committed, but unexpended, contractual work." *Id.* ¶ 38. Investors watch a contractor's backlog "because backlog represents the best indication of a company's future growth." *Id.* Underbidding meant that Smith, often over the objections of his own project teams, was dictating project terms so that S & W was selling fixed-price jobs either at a loss or with such small margin for error that the slightest adverse change in a project's economics would cause S & W to lose money on the job. *Id.* ¶ 53.

The plaintiffs quote or paraphrase several S & W employees about the underbidding policy: "According to a confidential source who worked for S & W as an assistant controller before and during the Class Period ('CS–1'), Smith was warned

by senior management that this policy would result in long-term disaster for the Company." *Id.* ¶ 54. "Roger LeFavor, Vice President of Strategic Planning, regularly challenged Smith and told Smith numerous projects could not be done for the bid price, but Smith overruled his objections." *Id.* ¶ 55.

The significance of this policy to the plaintiffs' legal claims is that, according to the plaintiffs, Generally Accepted Accounting Principles ("GAAP") required S & W to recognize the prospective losses from underbid projects in the period that S & W was first obliged to perform the contract. *Id.* ¶¶ 39–46. S & W's failure to do so, and its retention of the underbid projects in its backlog, the plaintiffs allege, rendered fraudulent all of S & W's financial statements issued during the Class Period.

The plaintiffs list ten projects which, according to several named and unnamed S & W employees, "were all bid at a loss pursuant to Smith and Langford's undisclosed policy" of underbidding. *Id.* ¶ 58. S & W allegedly underbid these projects by 10–40%; on one project, S & W's bid was approximately $70–80 million, whereas the bid of a competitor, Raytheon, for the same work was $120 million. *Id.* ¶¶ 60–61.

### 2. *The TPPI Project*

In 1996, S & W joined a consortium of contractors to construct an integrated ethylene and olefins complex in Indonesia for Trans Pacific Petrochemical Indotama ("TPPI"). *Id.* ¶¶ 62–63. In late 1997, "TPPI suspended work on the project because it had exhausted its funding for the project." *Id.* ¶ 65. As a result, in 1998 S & W incurred numerous expenses from the project— including payments to vendors for equipment shipped to Indonesia—- but received no corresponding payments. *Id.* ¶¶ 65–67. "CS–1 said that TPPI suggested to S & W that it try to get out of its

contracts with its vendors due to the suspension. Based upon this suggestion, S & W knew in late 1997 that the project was dead even though they had not received an official termination notice." *Id.* ¶ 65. The plaintiff further alleges that

> According to CS–1, ... beginning with the first quarter of 1998, S & W created phantom revenue and receivables from the TPPI project to cover S & W's project related costs by recording revenue equal to the amount of those costs. The purpose of recording this revenue was to avoid showing a loss from the project on S & W's financial statements.

*Id.* ¶ 67. Again according to CS–1, S & W booked $86.9 million in revenues from TPPI in 1998 and $53 million in 1999. *Id.* ¶ 68.

> According to CS–1, [Daniel] Martino [a former S & W senior accountant] and CS–2 [confidential source 2], Smith and Langford knew the equipment sent to Indonesia for the project was being sold for pennies on the dollar and that the project would not be restarted. Accordingly, S & W's statements that the TPPI project would likely restart were misleading and because Smith and Langford knew that the TPPI project would not resume, S & W should not have kept the TPPI project in the Company's backlog and should not have been booking phantom revenue and receivables from the project.

*Id.* ¶ 75.

### 3. *S & W's Liquidity Problems*

The Amended Complaint alleges that S & W began to experience cash flow problems in 1998 as a result of the underbidding policy and the suspension of TPPI. "According to Tim McBride, a former controller for S & W's industrial division, by the middle of 1998, S & W knew that the Company was 'starting to get strapped for

cash.'" *Id.* ¶ 70. "According to Daniel Gershkowitz, the original project manager on the Tiverton and Rumford projects," S & W began·to have trouble paying its vendors, and some vendors refused to deliver materials because they had not been paid. *Id.* ¶ 71.

Throughout 1998, according to CS–2, S & W circulated internal financial reports that showed that the Company was losing money, thereby conflicting with the Company's publicly disclosed financial results. *Id.* ¶ 72. "Anyone who had access to the monthly financials could see that it was not what was being said publicly. You could read them and compare them with the quarterlies he [Smith] was reporting and ask what he was smoking. Knowing what we knew inside and seeing the quarterlies—they just did not jibe." *Id.*

The Amended Complaint further describes the Company's increasing cash flow problems through 1998 and 1999. During this time, S & W was frequently unable to pay vendors or subcontractors. *Id.* ¶¶ 78–90. Smith and Langford became directly involved in deciding which subcontractors to pay and how much to pay them. *Id.* ¶¶ 87–88. "According to several different sources, those who called Smith regularly to collect money and threaten to walk off a project were usually the first to get paid." *Id.* ¶ 85. Toward the end of 1999, one of S & W's clients, Maine Yankee, "notified S & W in writing that it was in material breach of their [sic] contract for failing to pay its subcontractors and suppliers for work previously performed and for its inability to pay for work that was currently being performed and scheduled to be performed in the future." *Id.* ¶ 108. "S & W did not notify its shareholders of the Maine Yankee letter, and instead took immediate steps to keep the matter quiet." *Id.* ¶ 109.

*(i) The Credit Agreement.* To deal with S & W's cash flow problems, "Smith, Langford and other S & W personnel sought to obtain conventional long term financing through bonds, long or intermediate term bank loans, and preferred stock, but were unable to do so." *Id.* ¶ 91. S & W therefore entered into a new Credit Agreement with several banks to provide short-term financing. *Id.* ¶ 92. S & W announced the new Credit Agreement in a 10–Q filed on August 12, 1999. *Id.* However, the plaintiffs allege, "the 10–Q failed to disclose that, at the time S & W entered into the Credit Agreement, it was already in material default under Sections 6.06 and 9.01(f)(i) of the Credit Agreement, because it had failed to make timely payments to its vendors and subcontractors as their bills came due." *Id.* "Smith and Langford thus knew that S & W could not reasonably rely on the Credit Agreement for additional funds because the lenders would immediately be in a position to cancel the availability of future funds and to call in the existing indebtedness due to S & W's material defaults." *Id.* ¶ 93.

The plaintiffs allege further that

On October 28, 1999, S & W announced it was taking steps to raise cash. It announced that it was selling its headquarters building and its Nordic cold processing and storage business 'to concentrate on core competencies.' In reality, defendants knew that S & W was attempting to sell such assets because this was the only way in which S & W could obtain any material amount of cash with which to placate its bank lending consortium and avoid bankruptcy.

*Id.* ¶ 117.

The plaintiffs claim that "[b]y November 19, 1999, the lenders had discovered the various defaults and demanded that the Credit Agreement be restructured." *Id.* ¶ 118. The press release announcing this restructuring, however, did not reveal the

reasons for it or the terms of the new borrowing facility. *Id.*

*(ii). The Retirement Fund Stock Purchase.* On December 16, 1999, S & W announced that the S & W Retirement Plan Trust would buy one million shares of S & W stock at $15.35 per share and issued a press release stating that a fairness opinion with regard to the transaction had been issued by an independent investment bank. *Id.* ¶ 121–22. The plaintiffs allege that director John P. Merrill, Jr., "suddenly" resigned after this stock purchase because he was "in apparent disagreement" with it, and that S & W concealed his resignation from its shareholders "for several months." *Id.* ¶ 124.

*(iii). The Restatement.* On April 14, 2000, S & W filed its 10–K form for fiscal year 1999, which "reported revenue of $1.17 billion, net income of $20.5 million, and net assets of $324.3 million." *Id.* ¶ 144. Just over two weeks later, on April 30, 2000, S & W issued a press release that stated:

> Company officials were recently notified of an unanticipated cost overrun on a key project by a major subcontractor related to estimates to complete work during the first half of the current year. As a result, the Company conducted a thorough review of this project and, based on this review, the Company will record a provision of $27.5 million and will revise its 1999 financial statements and amend its 1999 Form 10–K.

*Id.* ¶ 148.

The plaintiffs contend that "these cost overruns were neither unanticipated nor previously unknown, nor were they just discovered pursuant to a review. Smith & Langford knew of the cost overruns since

Spring of 1999, and had been desperately trying to cope with these problems while they hid them from investors and prospective buyers." *Id.* ¶ 150.

*(iv). S & W Files for Chapter 11 Bankruptcy.* On May 8, 2000, S & W announced that it had signed an agreement with Jacobs Engineering Group ("Jacobs") for the sale of substantially all of S & W's assets. *Id.* ¶ 153. S & W also announced that it intended to file a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. *Id.* Upon this announcement, trading in S & W stock was suspended. *Id.* When trading resumed on May 19, 2000, the stock fell to $0.7031 per share. *Id.* ¶ 154. On June 2, 2000, S & W filed a petition in the Delaware Bankruptcy Court under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* *Id.* ¶ 155.

### B. *Allegations Against PwC*

PwC is a firm of certified public accountants.[2] *Id.* ¶ 24. Under the direction of its audit partner Robert Spear ("Spear"), PwC audited S & W's financial statements during the Class Period. *Id.* The plaintiffs assert that PwC is liable for violations of sections 10(b) and 18 of the Exchange Act, because PwC's unqualified audit opinions on S & W's 1997, 1998, and 1999 year-end financial statements were allegedly false and misleading. *Id.* ¶¶ 343–45.

There are three branches to the plaintiffs' allegations against PwC. First, the plaintiffs allege that PwC was aware of the full range of the alleged wrongdoing of Smith and Langford described above: the underbidding policy; the recording and reporting of phantom revenue from the TPPI project; S & W's hidden cash flow problems; S & W's false statements about

---

2. The certified public accounting firms, Coopers & Lybrand, LLP and Price Waterhouse, LLP, merged in 1998. The "PwC" referred to in this memorandum and order was actually Coopers & Lybrand for dates before the merger. Am. Compl. ¶ 24.

the restructuring under the Credit Agreement; and the failure to disclose that S & W was "on the verge of bankruptcy" when it sold one million shares to its employee retirement plan. *Id.* ¶ 341. Second, the plaintiffs argue that PwC failed to comply with Generally Accepted Auditing Standards ("GAAS"), and was aware of or recklessly disregarded the fraud committed by management by failing to follow up on a variety of red flags. *Id.* ¶¶ 350–53; 361. Third, the plaintiffs allege that the restatement of S & W's 1999 financials was an artifice designed to save face in light of S & W's financial collapse. *Id.* ¶ 361.

To support these claims, the plaintiffs make a handful of somewhat more specific allegations against PwC. First, the plaintiffs allege that PwC served as S & W's auditors for over fifty years, and received over $1 million in fees per year from S & W for auditing and consulting services. *Id.* ¶ 340. "As a result of its longstanding relationship with S & W and the nature of the accounting and auditing services rendered to the Company, PwC personnel . . . were regularly present at S & W's corporate headquarters throughout the year and had continual access to and knowledge of S & W's private and confidential corporate financial and business information . . ." *Id.* ¶ 341.

As to TPPI, the plaintiffs allege that

PwC and Spear allowed S & W to recognize this phantom revenue and receivables based upon S & W's representation that it believed TPPI would be resumed. There was no basis for this false representation and Spear and PwC would have discovered this had they chosen to independently test the representation, as they should have done for such a material contract.

*Id.* ¶ 67.

Furthermore, the plaintiffs allege that

S & W and PwC violated GAAP by recording revenue from the TPPI project that was never received after the project was suspended. In fact, since S & W actually knew that the TPPI project would not be continued, under GAAP, S & W was required to evaluate the remaining estimated costs on the project, calculate any expected, future revenue and determine whether there would be a loss on the project. Since S & W knew it was going to incur a substantial overall loss on TPPI, FAS [Financial Accounting Standards] No. 5 required that S & W accrue the loss as a charge to income. S & W and PwC failed to do so.

*Id.* ¶ 76.

### III. Analysis

#### A. *Pleading Requirements*

A court may grant a motion to dismiss for a failure to state a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In considering this motion, I must "accept as true all well-pleaded allegations and give the plaintiffs the benefit of all reasonable inferences." *Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir. 1999).

While the foregoing rules are applicable in a securities fraud case, a court, in such a case, must consider, in addition, the strict pleading requirements of the PSLRA and Fed.R.Civ.P. 9(b).

The PSLRA provides:

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant -

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1)-(2).

The First Circuit has held that the pleading standards set out in this statute are "congruent and consistent with the pre-existing standards of this circuit" under Rule 9(b). *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 193 (1st Cir.1999).

The plaintiff in a securities fraud action must specify each allegedly misleading statement or omission including its time, place and content. The plaintiff must provide factual support for the claim that the statements or omissions were fraudulent, that is, facts that show exactly why the statements or omissions were

misleading. If the plaintiff brings his claims on information and belief, he must set forth the source of the information and the reasons for the belief. *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 78 (1st Cir.2002) (internal citations and quotation marks omitted).

To state a prima facie case under section 10(b) and Rule 10b-5, a plaintiff must allege that the defendant intentionally or recklessly made a misrepresentation or omission of a material fact upon which the plaintiff relied and which proximately caused the plaintiff's injuries. *See, e.g., Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1216-17 (1st Cir.1996). Direct pleading of the "reliance" requirement was set aside by the Supreme Court for "fraud on the market" claims by virtue of the Court's decision in *Basic, Inc. v. Levinson,* 485 U.S. 224, 246-47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Reliance, for such claims, is "now presumed, and plaintiffs are held entitled to rely upon the 'integrity of the market' and information publicly released by corporations and their agents and employees." *Colby v. Hologic, Inc.,* 817 F.Supp. 204, 209 n. 7 (D.Mass.1993).

A plaintiff still must allege, even in a fraud-on-the-market case, that a defendant acted with scienter in order to establish liability under section 10(b) and Rule 10b-5. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). "To win a section 10(b) case, the plaintiff must show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." *Aldridge,* 284 F.3d at 82. The definition of recklessness for section 10(b) and Rule 10b-5 purposes involves "a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from

the standards of ordinary care ..." *Greebel*, 194 F.3d at 198 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th·Cir.1977)).

In this circuit, there is no "particular test to determine scienter ..." *Aldridge*, 284 F.3d at 82. Rather, the First Circuit has adopted a "case by case fact-specific approach." *Id.* A plaintiff may rely on a variety of forms of evidence, both direct and circumstantial. *See id.* "As part of the ·mix of facts, the plaintiff may allege that the defendants had the motive ... and opportunity ... to commit the fraud." *Id.* However, "merely pleading motive and opportunity, regardless of the strength of the inferences to be drawn of scienter, is not enough." *Greebel*, 194 F.3d at 197. The evidence, taken as a whole, must create a strong, and not merely a reasonable, inference of scienter. *Id.* at 195–96; *see also* 15 U.S.C. § 78u–4(b)(2). Yet a "strong" inference need not be an irrefutable one; a plaintiff must show only that "his characterization of the·events and circumstances as showing scienter is highly likely." *Aldridge*, 284 F.3d at 82.

Each defendant has challenged the plaintiffs' allegations that his conduct violated the antifraud provisions of the securities laws upon which the plaintiffs have sued.

### B. *Public Statements Other Than SEC Filings*

Certain of the statements made by or attributed to the defendants by the plaintiffs may not fall within the category ˙of statements giving rise to a claim under the antifraud provisions of the securities laws.

### 1. *Analysts' Statements; Boston Globe Article*

The plaintiffs allege that certain reports by securities analysts and an article that appeared in the *Boston Globe* contain false or misleading statements made by or attributable to Smith and Langford. Where no direct attribution to Smith or Langford is made, plaintiffs argue that either or both of these defendants can be held liable for a statement of S & W under the "group published information" doctrine. This doctrine, as adopted by a number of circuits, allows the plaintiff to "impute false or misleading statements conveyed in annual reports, quarterly and year-end financial results, or other group-published information to corporate officers." *In re Raytheon Secur. Litig.*, 157 F.Supp.2d 131, 152 (D.Mass.2001).

While the First Circuit had accepted the group-published information doctrine before the adoption of the PSLRA, it has not yet ruled on whether the doctrine survived the passage of the PSLRA. *See In re Cabletron Systems, Inc.*, 311 F.3d 11, 40 (1st Cir.2002). Even assuming that the doctrine remains viable in this circuit, the plaintiffs still must make "sufficiently particularized allegations that the individual officer knew about the fraud" in order to attribute statements by S & W to either Smith or Langford. *Raytheon*, 157 F.Supp.2d at 152 (citing *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 367–68 (1st Cir.1994)).

The reports and the article at issue are the following, as alleged in the Amended Complaint.

• **The April 1998 Salomon Smith Barney Analyst Report**: At the Salomon Smith Barney ("SSB") Industrial Capital Goods Conference, Smith and Langford are alleged to have misleadingly described S & W's backlog and the likelihood of the resumption of the TPPI project. SSB analysts repeated these statements in a report on the Company. Am. Compl. ¶¶ 178–180.

• **The January 1999 Morgan Stanley Dean Witter Report**: In early 1999, Smith and Langford allegedly stated to analysts that S & W had "scrubbed the backlog." Analysts from Morgan Stanley Dean Witter ("MSDW") included this information in a report released on January 27, 1999. *Id.* ¶ 228.

• **The May 5, 1999 Credit Suisse First Boston Analyst Report**: A report issued by Credit Suisse First Boston ("CSFB") allegedly contained false statements about growth in revenues and operating margins and about the likelihood of a resumption of TPPI. *Id.* ¶¶ 257–259.

• **The June 1999 DLJ Report**: In April of 1999, Smith made a presentation to the Environmental Services and Engineering and Construction Conference sponsored by Donaldson, Lufkin and Jenrette ("DLJ"). On June 9, 1999, DLJ issued a report that included an edited transcript of Smith's presentation. The remarks of Smith, as reported in the transcript, included allegedly false statements regarding improved margins in backlog and regarding future profitability. *Id.* ¶ 251.

• **The October 28, 1999 Press Report**: An article contained allegedly misleading statements by Smith to a *Boston Globe* reporter to the effect that the Company was not facing insolvency. *Id.* ¶¶ 286–288.

• **The December 30, 1999 SSB Analyst Report**: A report by SSB analysts allegedly contained materially false statements about backlog, cash position and margins. *Id.* ¶¶ 313–315.

The First Circuit has recently adopted the so-called "entanglement" test for liability for third-party statements. *See Cabletron*, 311 F.3d at 37. Under the rule announced in *Cabletron*, "liability may attach to an analyst's statements where the defendants have expressly or impliedly adopted the statements, placed their imprimatur on the statements, or have otherwise entangled themselves with the analysts to a significant degree[.]" *Id.* at 37–38 (quoting *Schaffer v. Timberland Co.*, 924 F.Supp. 1298,1310 (D.N.H.1996)) (internal quotation marks omitted). *Cabletron* also held that "an entanglement claim will be rejected if it merely suggests or assumes that company insiders provided the information on which analysts or other outsiders based their reports." *Id.* at 38. (citing *Suna v. Bailey Corp.*, 107 F.3d 64, 73 (1st Cir.1997) and *In re No. Nine Visual Tech. Corp. Sec. Litig.*, 51 F.Supp.2d 1, 31 (D.Mass.1999)). *Suna* also rejects the notion that general statements regarding a company's "practice" of "communicat[ing] regularly with securities analysts . . . and [of] provid[ing] detailed 'guidance' to these analysts" are sufficiently particularized to survive a motion to dismiss, emphasizing that Rule 9(b)'s heightened pleading requirements apply. 107 F.3d at 73.

The allegations in the Amended Complaint at ¶¶ 364–371 (pertaining to "guidance to securities analysts and use of them to provide false information to the securities market") are nearly identical to those found in *Suna* to be insufficient to "satisfy the requirements of Rule 9(b) . . . because appellants failed to identify the statements made by [an individual defendant] or describe how those statements were false or misleading." *Id.*

However, in the sections of the Amended Complaint dealing with specific statements, the plaintiffs allege that SSB "repeated [Smith and Langford's] representations" regarding backlog and the TPPI project's status in SSB's April 1998 report, Am. Compl. ¶ 179; that CSFB's report was "based on discussions with" or "representations of" Smith and Langford, *id.* ¶¶ 257–258; and that the December 1999 SSB report (which plaintiffs concede expressed doubt as to S & W's

explanation for its poor results) was "based upon discussions with Smith and Langford," *id.* ¶ 313. Although none of these allegations contains a " 'specification of the time, place and content of an alleged false representation[,]' " *Greebel,* 194 F.3d at 193 (quoting *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228 (1st Cir.1980)), by Smith or Langford in anything but the most general terms, *Cabletron* indicates that these allegations may meet the entanglement test. *See Cabletron,* 311 F.3d at 38 (discussing examples of analysts' statements based on company communications.)

■ The statements contained in the DLJ report present a somewhat clearer set of facts for making a determination of entanglement. The Amended Complaint alleges that several statements made by Smith at the conference sponsored by DLJ in April of 1999 were false or misleading. However, the DLJ report, which reprinted "an edited transcript of a slide presentation" by Smith, was released on June 9, 1999 as stated earlier.[3] The DLJ report also appears to contain content prepared by DLJ analysts and a transcript of a question-and-answer period that followed Smith's presentation.

Smith and Langford contend that "[p]laintiffs have not pled with specificity *who* allegedly supplied the information set forth in the DLJ report ... *how* that information was supplied or *how* Defendants controlled the content of those third-party statements. Thus, these state-ments... are not attributable to Defendants, and they are not actionable, as a matter of law." Defendants H. Kerner Smith and Thomas L. Langford's Joint Memorandum of Law in Support of Their Motion to Dismiss the Consolidated and Amended Class Action Complaint ("Smith and Langford Joint Memorandum") at 70 (citing *In re Medimmune, Inc. Sec. Litig.,* 873 F.Supp. 953, 965 (D.Md.1995)). They also point out the two-month period between the making of the statements and their publication in the DLJ report.

The plaintiffs counter that the statements alleged to be misleading are contained in that portion of the DLJ report that sets forth a "substantially complete, *verbatim transcript* (even the content of the accompanying slides are [sic] reproduced) of a presentation *delivered by Smith on April 14–15, 1999 at Donaldson, Lufkin's 1999 Environmental Services and Engineering and Construction Conference in New York.*" Lead Plaintiffs' Brief in Opposition to Smith and Langford's Motion to Dismiss ("Plaintiffs' Opposition to Smith and Langford Motion") at 67 (emphasis in original). Because the First Circuit has clarified the circumstances in which a determination of entanglement may be made, and because I conclude that the plaintiffs have sufficiently described the "who, what, when, where and how" with respect to the statements made by Smith at the DLJ conference, I will discuss *infra* the materiality of these statements and those contained in the SSB and

---

**3.** The DLJ report is referred to in the Amended Complaint and included as Exhibit 42 in the Joint Appendix in Support of Defendants H. Kerner Smith and Thomas L. Langford's Motion to Dismiss the Consolidated and Amended Class Action Complaint ("Smith and Langford Joint Appendix"). This document is explicitly referred to in the Amended Complaint. It is appropriate, therefore, for me to consider it in full in connection with the motions to dismiss. *Shaw,* 82 F.3d.at 1220 ("In deciding a motion to dismiss a securities action, a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment.")

CSFB reports and, where appropriate, I will discuss, as well, the sufficiency of the allegations regarding the defendants' state of mind as concerns these statements.

■ The allegations in the Amended Complaint with respect to the MSDW report appear to attribute a quote (the statement that S & W had "scrubbed the backlog") to one or both of the individual defendants; however, this phrase, which appears twice in the MSDW report, is not attributed by MSDW to either of the individual defendants or to S & W generally.[4] The allegations thus are insufficient to support the inference that S & W or either of the individual defendants, even under the *Cabletron* rule, was sufficiently entangled in the issuance of the statement of the MSDW report to warrant the attachment of liability, and the report itself does not indicate how MSDW learned of the information it contains.

■ Similarly, the *Boston Globe* article is alleged to have included a misleading statement by Smith that S & W was not facing bankruptcy. Although the article itself refers to an interview with Smith the day before publication, it quotes him on the subject of bankruptcy only indirectly. *See* Ross Kerber, *Troubled Firm to Sell its Building,* Boston Globe, Oct. 28, 1999, at C-1.[5] As with the DLJ report, in which the preparer of the report cites Smith as the originator of the allegedly misleading slide presentation, it may be appropriate to allow such an indirect statement to be attributable to Smith. Although the First Circuit has not yet given guidance on whether such circumstances are sufficient to create an entanglement, the Second Circuit faced such a set of facts in *San Leandro Emergency Medical Group Profit*

*Sharing Plan v. Philip Morris Companies,* 75 F.3d 801 (2d Cir.1996). That Court concluded that where indirectly quoted statements attributed only to unnamed executives appeared in an article that also quoted named company representatives, "it might be reasonable to permit a factfinder to infer that the statement is attributable to the named officials." *Id.* at 810.

The plaintiffs claim that the statement denying imminent bankruptcy was false or misleading because "Smith knew [that] S & W was insolvent and...without an additional infusion of cash or a buyer, S & W would have no choice but to file for bankruptcy." Am. Compl. ¶ 288. The plaintiffs, however, have failed to provide any facts supporting their explicit contention that S & W was insolvent or the implied contention that S & W was considering bankruptcy at the time of the article. Moreover, the article's statement that "bankruptcy isn't being considered", appearing as it does in the middle of an article that also mentions S & W's breach of financial covenants under its Credit Agreement and that quotes analysts from major investment banks who express concerns about earnings, does little to change the total mix of information available to investors. *See Basic,* 485 U.S. at 231–32, 108 S.Ct. 978 (adopting as materiality standard for § 10b and Rule 10b–5, the principle that " 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix, of information made available.' " (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976))). I conclude, therefore, that, even if the information in the

---

4. The MSDW report is included as Exhibit 22 in the Smith and Langford Joint Appendix.

5. This article is referred to in the Amended Complaint and included as Exhibit 29 in the Smith and Langford Joint Appendix.

article can be attributed to Smith, the plaintiffs have failed to make allegations that particularize the basis on which the information in the article is said to be misleading and that, in any event, any omission regarding S & W's financial position is immaterial in light of what is disclosed in the article overall.

### 2. Corporate "Puffery" and Forward–Looking Statements

The plaintiffs also direct the court's attention to statements touting "improved margins" from projects in backlog that were allegedly underbid. The specific statements in the Amended Complaint to which this argument refers are the following;

- **The April 15, 1999 Press Release**, which quotes Smith as stating:

 "We expect the improved margins included in our substantial backlog of work to be performed .... and ... to produce improved results in the second half of this year." Am. Compl. ¶ 248.

- **The DLJ Report**, containing quotes from Smith's presentation:

 "On new bids, we are driving as-sold operating margins to 8–10% by being more focused and selective and sticking to the four core business areas that I am covering." Id. ¶ 251.

 "We do have improved as-sold margins. They are approximately double the backlog margins that we had when I joined the company." Id.

- **The April 27, 1999 Press Release**, which quotes Smith as saying:

 "We have also taken steps to be more selective in avoiding high risk, lower margin business. We expect that the improved margins included in our backlog, and our continuing drive to reduce costs and operating expenses, will pro-duce improved results in the second half of this year." Id. ¶ 254.

- **The October 27, 1999 Press Release**, which quotes Smith as stating:

 The Company has taken strong measures to prevent ... losses from recurring, including ... implementing a more selective process to determine which prospects [sic] will be bid and selecting higher as-sold margins

 . . . . .

 We continue to expect that the improved margins included in our substantial backlog of work will be realized, and our continuing drive to reduce operating expenses will improve financial results.

 Id. ¶ 284.

The plaintiffs' challenge to S & W's backlog figures includes a claim that the statements were misleading or inadequate as predictors of S & W's future performance. See, e.g., Am. Compl. ¶ 284 ("Smith's statements were intended to create the false impression that a complete house-cleaning had been accomplished and that S & W was now poised to produce earnings unimpacted by the money-losing projects included in the backlog, and to conceal the fact that further massive losses were on the horizon."). As an initial matter, I note that none of these statements is attributed to Langford. Nor is Langford even alleged to have been aware of the statements. These allegations, therefore, cannot support a claim against Langford. As to Smith, the statements fall within the safe harbor provided by the PSLRA for forward-looking statements. See 15 U.S.C. § 784u–5. In other words, statements about "improved margins" are predictions of the profit margins that projects would achieve in the future. See Weiss v. Mentor Graphics Corp., No. CV–97–1376–ST; 1999 WL 985141, at * 11 (D.Ore. Oct. 6,1999) (holding that a reference "to back-

log as a predictor of future performance is a forward-looking statement").

"[C]ourts in the First Circuit generally have declined to impose liability for so-called 'forward-looking statements'—that is, broad statements that express optimism about a company's future—because these courts regard such statements as unlikely, as a matter of law, to be material to a reasonable investor." *Carney v. Cambridge Technology Partners, Inc.*, 135 F.Supp.2d 235, 245 (D.Mass.2001). As a reflection of the lighter scrutiny to which forward-looking statements are subjected, the PSLRA creates two specific "safe harbors." "[T]he first shelters forward-looking statements that are accompanied by meaningful cautionary statements … [and the second] precludes liability for a forward-looking statement unless the maker of the statement had actual knowledge it was false or misleading." *Greebel*, 194 F.3d at 201 (citing 15 U.S.C. § 78u–5(c)(1)(A)(i) & (B)).

Smith's DLJ presentation began with a warning to his audience that he would be making forward-looking statements which "represent management's best judgment as to what may occur in the future," but which are subject to change for a variety of reasons. The April 15, 1999 press release contains similar cautionary statements. Smith and Langford Joint Appendix, Ex. 33. Furthermore, as discussed *infra*, the plaintiffs have not adequately pleaded that S & W's disclosures regarding backlog and the bidding of contracts were false or misleading. To prevail on a claim that Smith should be liable in fraud for stating that S & W was aiming to achieve margins of 8–10% on new business, or that management expected to obtain more high-margin business, the plaintiffs would have to show that he *actually knew*—and was not simply reckless in not knowing—that these statements were un-

true. 15 U.S.C. § 78u–5(c)(1)(B); *see also Greebel*, 194 F.3d at 201.

Smith's statements regarding "strong measures" and "focus" "are typical of the kind of 'self directed corporate puffery' and sales talk that courts in this circuit have shielded from liability." *Carney*, 135 F.Supp.2d at 245 (quoting *Shaw*, 82 F.3d at 1218). Such "broad, optimistic statements about a company's future" cannot be the basis for a claim under the securities laws. *Id.* "The corporate puffery rule applies to loose optimism about both a company's current state of affairs and its future prospects." *Fitzer v. Security Dynamics Technologies*, 2000 WL 1477204, *8 (D.Mass.2000) (citing *In re Boston Tech, Inc.*, 8 F.Supp.2d 43, 54 (D.Mass. 1998)).

D. *Adequacy of Plaintiff's Remaining Claims Under Section 10(b), Rule10b–5 and PSLRA Standards*

1. *The Statements*

Some sixty pages of the 137–page, 406–paragraph Amended Complaint list approximately thirty-seven documents (including the analysts' reports and *Boston Globe* article discussed above) that the plaintiffs allege to contain false or misleading statements. *Id.* ¶¶ 160–338. Those documents include virtually every financial disclosure by S & W between January 1998 and May 2000. I list the remaining documents below and summarize the fraudulent statements each allegedly contains:

- **The January 22, 1998 Press Release**: misleading revenue and earnings figures for quarter and year ending Dec. 31, 1997; misleading backlog figure; misleading disclosure of problems with TPPI project. *Id.* ¶¶ 162–166.
- **The 1997 10–K and Smith's letter to shareholders**: revenue and net in-

come materially overstated; misleading backlog figure; misleading balance sheet figures; misrepresentation of level of concentration in credit risk in S & W's business; misleading disclosure of problems with TPPI project. *Id.* ¶¶ 167–175.

- **The March 17, 1998 Press Release:** misleading in its report of the Pha Lai II Power Plant project in that it did not disclose that S & W had underbid to get the project and would lose money on the project. *Id.* ¶¶ 176–177.

- **The April 21, 1998 Press Release:** misleading revenue and earnings figures for first quarter of 1998; misleading statements and omissions about TPPI. *Id.* ¶¶ 181–185.

- **The May 5, 1998 Press Release:** misleading in its report of the Maine Yankee project in that it did not disclose that S & W had underbid to get the project and would lose money on the project. *Id.* ¶¶ 186–187.

- **The March 1998 10–Q:** revenue and earnings figures materially overstated; misleading backlog figure; misleading balance sheet figures; misleading disclosure of problems with TPPI project. *Id.* ¶¶ 188–194.

- **The July 21, 1998 Press Release (including statements by Smith):** misleading revenue and earnings figures for second quarter of 1998; misleading statements and omissions about TPPI; misleading omission of liquidity problems. *Id.* ¶¶ 195–200.

- **The August 4, 1998 Press Release:** misleading in its report of the Maine Yankee project in that it did not disclose that S & W would lose money on the project and that S & W's liquidity problems would prevent S & W from being able to perform the contract adequately. *Id.* ¶¶ 201–203.

- **The June 1998 10–Q:** revenue and earnings figures materially overstated; misleading backlog figure; misleading balance sheet figures; misleading disclosure of problems with TPPI project. *Id.* ¶¶ 204–210.

- **The October 26, 1998 Press Release:** misleading in its report of the Cal Energy project in that it did not disclose that S & W had underbid to get the project and would lose money on the project. *Id.* ¶¶ 211–212

- **The October 27, 1998 Press Release (including statements by Smith):** misleading revenue and earnings figures for third quarter of 1998; misleading statements about backlog; misleading statements and omissions about TPPI. *Id.* ¶¶ 213–218.

- **The September 1998 10–Q:** revenue and earnings figures materially overstated; misleading backlog figure; misleading balance sheet figures; misleading disclosure of problems with TPPI project. *Id.* ¶¶ 219–225.

- **The November 16, 1998 Press Release:** misleadingly represented that S & W's success in obtaining new projects was due to its competitiveness, rather than underbidding. *Id.* ¶¶ 226–227.

- **The January 26, 1999 Press Release (including statements by Smith):** misleading revenue and earnings figures for fourth quarter of 1998; misleading statements about backlog; misleading statements and omissions about TPPI; phantom revenue from TPPI; misleading statement by Smith that S & W's 1998 losses were an isolated event explainable by unanticipated circumstances. *Id.* ¶¶ 229–237.

- **The 1998 10–K (including Smith's letter to shareholders):** revenue and earnings materially overstated; misleading backlog figure; misleading

balance sheet figures; misleading disclosure of problems with TPPI project. *Id.* ¶¶ 238–245.

- **The April 15, 1999 Press Release**: misleading statements by Smith about projected earnings and statements about what earnings would have been absent costs on two international projects. *Id.* ¶¶ 246–250.

- **The April 27, 1999 Press Release (including statements by Smith)**: misleading revenue and earnings figures for first quarter of 1999; misleading statements by Smith about improved margins in backlog. *Id.* ¶¶ 252–256.

- **The March 1999 10–Q**: revenue and earnings figures materially overstated; misleading backlog figure; misleading balance sheet figures; misleading statements that S & W had sufficient funds to meet its needs; misleading disclosure of problems with TPPI project. *Id.* ¶¶ 260–266.

- **The June 28, 1999 Press Release**: misleading in its report concerning the Cordova Energy project in that it did not disclose that S & W had underbid to get the project and would lose money on the project. *Id.* ¶¶ 267–269.

- **The July 26, 1999 Press Release**: misleading revenue and earnings figures for second quarter of 1999; misleading statements by Smith about improved margins in backlog. *Id.* ¶¶ 270–273.

- **The June 1999 10–Q**: revenue and earnings figures materially overstated; misleading backlog figure; misleading balance sheet figures; misleading statements that S & W had sufficient funds to meet its needs; misleading disclosure of problems with TPPI project. *Id.* ¶¶ 274–280.

- **The October 27, 1999 Press Release**: misleading revenue and earnings figures for third quarter of 1999; misleading statements about negotiations for new loans because it omitted that S & W was facing financial collapse and could not obtain these loans; misleading statements about backlog and margins. *Id.* ¶¶ 281–285.

- **The September 1999 10–Q**: revenue and earnings figures materially overstated; misleading backlog figure; misleading balance sheet figures; belated, inadequate, and misleading statements about the severity of S & W's financial difficulties; misleading disclosure of problems with TPPI project. *Id.* ¶¶ 289–297.

- **The December 1, 1999 Restructuring Press Release**: misleadingly touted restructuring of Credit Agreement that was actually demanded by S & W's lenders because S & W was in a workout situation; statement that proceeds of sale of headquarters would be used to reduce debt and for general corporate purposes was false because the proceeds were committed to the banks that were providing the credit facility; statements about new projects false or misleading because S & W obtained them through underbidding and was on the verge of bankruptcy. *Id.* ¶¶ 298–304.

- **The December 16, 1999 ESOP Press Release**: statement that sale price of shares to retirement plan was fair was false because opinion had been based on false financial data; statement that "operating results would meet analyst expectations" was false and misleading. *Id.* ¶¶ 305–306.

- **The December 21, 1999 Building Sale Press Release**: materially false representation that the sale would contribute to S & W's future growth

when all proceeds were committed to pay S & W's existing lenders. *Id.* ¶¶ 307–310.

- **The December 28, 1999 Press Release**: misleading in its report of the AES Enterprise project in New Hampshire in that it did not disclose that S & W had underbid to get the project and would lose money on the project. *Id.* ¶¶ 311–312.
- **The January 25, 2000 Press Release**: misleading revenue and earnings figures for fourth quarter of 1999; false statements about backlog and liquidity. *Id.* ¶¶ 316–320.
- **The March 20, 2000 Press Release**: misleading in its report of the AES Enterprise project in Texas in that it did not disclose that S & W had underbid to get the project and would lose money on the project. *Id.* ¶¶ 321–323.
- **The March 30, 2000 NT 10–K**: misleading revenue and earnings (loss) figures; false statements about backlog (including misleading disclosures regarding TPPI). *Id.* ¶¶ 324–326.
- **The 1999 10–K**: materially overstated revenue and earnings figures; misleading balance sheets; misleading statements about liquidity (including misleading disclosures regarding TPPI). *Id.* ¶¶ 327–330.

### 2. *The TPPI Project*

■ Each 10–Q, 10–K and quarterly press release described above allegedly contains misleading disclosures regarding TPPI. The crux of plaintiffs' argument is that (1) S & W did not disclose that the project was terminated upon the suspension of work in the fourth quarter of 1997, *see, e.g.*, Am. Compl. at ¶ 166 ("TPPI was effectively, if not officially, terminated"); (2) S & W wrongfully failed to take a charge for its losses on TPPI at the time of the "effective" termination, *see id.*; (3) S & W continued to recognize "phantom revenue and receivables" from the project during the Class Period, *id.*, without disclosing the amount of such revenue, *see id.* ¶ 341(2) ("S & W's disclosures were incomplete because S & W never disclosed that it had booked $86.9 million of revenue in 1998 and $53 million of revenue in 1999"); and (4) S & W misled investors by using an overly high estimate of the resale proceeds it would receive from the sale of TPPI equipment in disclosing the amount of the charge it would take if TPPI were to be cancelled, *see, e.g., id.* ¶ 209.

The claims based on alleged misrepresentations concerning the status of the TPPI project fail to meet the particularity standard because the allegations concerning these claims do not set forth "facts that show exactly why the statements or omissions were misleading." *Greebel*, 194 F.3d at 193–94. First, the allegations themselves are internally inconsistent as to the point at which the project was known to have been "effectively, if not officially, terminated," as alleged in paragraph 166 of the Amended Complaint. In paragraph 65 of the Amended Complaint, the plaintiffs allege that S & W *knew* in 1997 that the TPPI project was dead, and that S & W would not likely ever receive further payments. In paragraph 74, the plaintiffs revise the categorical knowledge alleged in paragraph 65. In paragraph 74, the plaintiffs say that in December, 1997, S & W knew only that it was "unlikely the project would ever restart." "By December 1998," paragraph 74 continues, "that was a certainty." In that same paragraph, however, the plaintiffs also allege that it was "clear" by January 1999 that "the project would not restart," because, by that time "TPPI had told S & W that the slight prospect that had existed during 1998 that they would find an investor to fund the

project had fallen through." The paragraph goes on to say, without elaborating on the source of or reasons for this conclusion, that it was at this point that it was a "certainty" that S & W would receive no further payments from TPPI.

Of course, the Amended Complaint is to be read with indulgence toward the plaintiffs, but these conflicting allegations undermine the sufficiency of any claim that S & W's disclosures regarding the status of TPPI were false. Did the defendants know or have reason to know that the project was "dead" in late 1997 (even though, as the plaintiffs concede, there existed a slight prospect of a restart as late as "during 1998" Am. Compl. ¶ 74), by December 1998 or by January 1999?[6] With conflicting allegations concerning S & W's knowledge of TPPI's death, the plaintiffs undermine their own assertion that the disclosures in 1998 were false or misleading.

Second, and quite apart from the conflicting dates noted above, the specific allegations offered to support the contention that Smith and Langford had actual knowledge throughout the Class Period that the TPPI project had been terminated, and that therefore the continued recognition of revenue from that project was fraudulent, on examination, assert much less than the plaintiffs claim for them.

The first such allegation reads:

[I]n the fourth quarter of 1997, TPPI suspended work on the project because it had exhausted its funding for the project ... CS–1 said that TPPI suggested to S & W that it try to get out of its contracts with its vendors due to the suspension. Based upon this suggestion, S & W knew in late 1997 that the project was dead even though they had not received an official termination notice. S & W also knew at this point that it was unlikely it would ever receive any additional payments on TPPI.

Am. Compl. ¶ 65.

As support for the contention that Smith and Langford knew that TPPI was dead in late 1997, the allegation has a number of problems. First, the plaintiffs claim that CS–1 said that "TPPI suggested" a course of action to S & W. The allegation does not state who at TPPI made the suggestion to whom at S & W or when or where the suggestion was made. It does not state that the "suggestion" was communicated to Smith or Langford. Furthermore, the suggestion by the unidentified person at TPPI to the unidentified persons at S & W was that S & W try to mitigate its costs during a suspension of the project. There is no allegation even that *TPPI* itself believed the project to be "dead" or terminated. To be sure, the Amended Complaint alleges that the project was suspended because funding had been exhausted—but there is no allegation

6. I recognize, of course, that one could read the Amended Complaint so that the last two dates are not inconsistent. The occurrence by December 1998 of an event indicating that the project would not restart would be information available for disclosure by January, 1999. I note, however, that the Amended Complaint makes a specific reference to an event in January, 1999 which tends to make that a distinct date at which conclusions about TPPI were drawn. Paragraph 77 alleges that TPPI was discussed at a special board meeting in January 1999, at the conclusion of which "it was evident to the Board ... that it was unlikely that the project would ever restart." But even if one assumes no inconsistency between the late December 1998 date and the January 1999 date, the discrepancy remains between the allegation in paragraph 65 that the defendants knew that the project was dead in late 1997 and the allegations in paragraph 74 that the defendant knew in 1997 that it was unlikely that TPPI would be restarted and that it was only a certainty or clear in December, 1998 or in January, 1999 that the project would not restart.

of specific facts to support the claim in paragraph 65 that the amorphous "S & W," not to mention Smith and Langford, knew that the TPPI project could not be resuscitated, and that suspension was in fact a termination of the project.

The second allegation offered to support the contention that Smith and Langford knew throughout the Class Period that TPPI was dead is the allegation that "[b]y August, 1998, S & W had obtained approval from TPPI to resell the project materials and equipment." *Id.* ¶ 73. This allegation, like the last, provides no reasonable basis for inferring that the project was terminated and not merely suspended, or that Smith and Langford knew that the project was terminated.

As noted above, the Amended Complaint also alleges that CS–1 stated that by January 1999, "it was clear that the project would not restart." *Id.* ¶ 74. The Amended Complaint follows this assertion with the statement, attributed to no source, that "[b]y that time, TPPI had told S & W that the slight prospect that had existed during 1998 that they would find an investor to fund the project had fallen through." *Id.* The Amended Complaint does not explain the basis for these conclusory statements. CS–1's statement does not explain to whom "it was clear" that the project was terminated. The allegation about what TPPI told S & W does not explain what person at TPPI imparted the information, what person at S & W received the communication, or what form the communication took. For that matter, neither of these allegations even mentions Smith or Langford by name.

Next, the Amended Complaint alleges that, "[a]ccording to CS–1, Martino and CS–2, Smith and Langford knew the equipment sent to Indonesia for [the TPPI project] was being sold for pennies on the dollar and that the project would not be restarted." *Id.* ¶ 75. This statement too is entirely conclusory. It provides no details to explain the basis for the sources' belief as to what Smith and Langford knew about sales of equipment in Indonesia and the prospects for restarting the project. Indeed, no detail is provided that would substantiate that discounted equipment sales ever took place and how the plaintiffs' sources knew about such sales, let alone when such sales are alleged to have begun, and what was actually sold.

Finally, the Amended Complaint alleges that by the conclusion of a "special meeting" of S & W's board of directors in January 1999, "it was evident to the Board that the TPPI project had already caused S & W serious financial problems and that it was unlikely the project would ever restart." *Id.* ¶ 77. The allegation fails to state even whether Smith and Langford attended the meeting or what happened at the meeting to make it evident that TPPI had caused S & W's serious financial problems and that it was unlikely that the project would restart.

If the allegations concerning whether the defendants had knowledge in 1997, 1998 or 1999 that TPPI was effectively terminated are insufficient, so too are the allegations concerning the recognition and reporting of what the plaintiffs call phantom revenue associated with the project. Here the insufficiency lies most significantly in their debility as support for a strong inference of the defendants' scienter. Because the Amended Complaint does not allege facts supporting with particularity the allegation that the defendants knew that TPPI would never be restarted and generate revenues, one cannot say that the decision to continue to recognize and report revenues from the suspended project on an accrual basis amounted to a misrepresentation recklessly made or made with intent to defraud.

Whether it was appropriate to recognize and report these revenues, once the project had been suspended, is a matter of judgment "dependent on the knowledge that the defendants had at the time they made the [relevant accounting] decision." *In re Galileo Corp. Shareholders Litig.,* 127 F.Supp.2d 251, 265 (D.Mass.2001). As such, the decision to recognize and report revenues from the suspended TPPI project does not give rise to a strong inference of scienter.

Perhaps the greatest obstacle to the sufficiency of the allegations of fraud in connection with disclosures regarding TPPI exists in what S & W actually reported about TPPI in the relevant period. In its reports on forms 10–Q and 10–K, filed with the SEC for the reporting periods between March 30, 1998 and December, 1999, S & W reported the suspension of TPPI, the steps S & W was taking to mitigate costs, the impact on pre-tax income of a cancellation of the project at particular points in time, and other risks to S & W associated with the project.[7] With these disclosures, S & W included the amount of backlog represented by the unexpended portion of the TPPI contract. The 1997 10–K disclosed TPPI-related backlog of $537.9 million, Am. Compl. ¶ 173, while the 1998 10–K and the 1999 10–K disclosed TPPI backlog of $451 million, *id.* ¶ 243, and $398 million, respectively. Thus, the $86.9 million and $53 million of "phantom revenue" and its source are easily deduced from the 10–Ks, and are, moreover, accompanied by discussions of S & W's revenue recognition policies and their effects on backlog calculations.

3. *S & W's Alleged Underbidding Policy*

■ The plaintiffs' most sweeping assertion is the claim that S & W intentional-

ly "underbid" a series of major contracts at Smith's behest and with Langford's acquiescence, if not his active participation. This claim implicates, during the proposed Class Period, each 10–Q (signed by Langford), each 10–K (signed by Smith and Langford), each quarterly earnings release (unsigned, though officers are occasionally quoted), and each press release (also unsigned) announcing the success of S & W in winning a bid or securing a new contract. My conclusion, however, is that while the Amended Complaint is rife with conclusory statements, it is ultimately short on concrete facts—the who, what, where, when, and how—sufficient to state a claim that S & W's disclosures were deficient, and that the defendants engineered or willfully disregarded the deficiencies.

The practice that plaintiffs characterize as "underbidding" is one of bidding projects at a loss or at very thin margins. *See* Am. Compl. ¶ 53. The practice is alleged to have been misleading, because the projects which S & W obtained by underbidding were nevertheless included in backlog, and financial statements were based on projected profit margins that could never materialize. Although the plaintiffs suggest that the motive for the alleged underbidding was a fraudulent scheme to inflate S & W's backlog to make the Company more attractive to a potential purchaser, the specific allegations of the Amended Complaint do not support this theory. Instead, those allegations make out, at most, a case of mismanagement or misguided corporate strategy, neither of which is actionable under the securities laws. "There is no liability for securities fraud, however, if what is complained of is poor management. Only fraud, not poor management or even gross mismanage-

---

7. These documents are integral to or explicitly referred to in the Amended Complaint and are included as exhibits in the Smith and Langford Joint Appendix.

ment is actionable under the securities laws." *Carney,* 135 F.Supp.2d at 252 (citations and internal quotation marks omitted).

Separating the underbidding allegations into their two component parts—the allegedly misleading failure of the defendants to disclose the policy and the resulting overstatement of S & W's results—I conclude that neither part can be sustained. First, S & W's policy of underbidding (if such a policy was in fact established) does not give rise to a duty to disclose. Secondly, despite plaintiffs' efforts to meet the pleading standards of the PSLRA and Rule 9(b), the allegations of inflated financials are not pleaded with the requisite particularity.

The plaintiffs quote Ray Burke, a former project manager at S & W, who said, in reference to underbidding, that he disagreed with Smith's "business strategy." Am. Compl. ¶ 52. Ronald Protasewich, purchasing project manager, said: "We took jobs at a loss to start with just to get in the market place. If we executed them perfectly, we wouldn't make any money." *Id.* ¶ 53. According to one confidential source, Smith was warned by "senior management" that the policy would mean disaster for the Company. *Id.* ¶ 54. According to another, "Winning a job was not good—it was like 'how much money are we going to lose on this?'" *Id.* Roger LeFavor, vice president of strategic planning, allegedly told Smith that "numerous" unnamed projects could not be done for the bid price. *Id.* ¶ 55. Finally, Tim McBride claimed that a project for U.S. Sugar "was underbid," and Smith knew that it was underbid. *Id.* ¶ 57.

The first two statements explicitly acknowledge that the alleged underbidding policy was a "business strategy," albeit one with which the sources disagreed. Protasewich even provides a non-fraudulent explanation for the policy: its purpose was "to get in the market place." The other statements, likewise also do no more than suggest that Smith established a business strategy with which the speakers disagreed and which may have been unwise.

Although the plaintiffs repeatedly characterize the policy as something that "Smith and Langford" framed and implemented; *see, e.g.,* Am. Compl. ¶¶ 52, 58, 90, Langford is not mentioned at all by the plaintiffs' sources; his liability, if any, therefore must be predicated on his signing of the quarterly and annual reports, which the plaintiffs claim were fraudulent in part because they project unrealistic profit margins in light of the underbidding strategy.

What S & W is alleged to have done, in essence, is to have offered its services to customers at a discount. Though plaintiffs allege that each of ten enumerated projects was underbid by "10% to 40%," Am. Compl. ¶ 61, they are not able to provide more specific allegations as to the amount of the loss S & W experienced on any one of these ten projects. The discussion of competitor Raytheon's bid of $120 million for a job on which S & W bid $70–$80 million, is not particularly enlightening in this context—even drawing all inferences in favor of the plaintiff. No allegation is made, for instance, that this difference represents a loss as opposed to an aggressive bid by S & W, or, indeed, an inflated bid by Raytheon. *See* Am. Compl. ¶ 60. Furthermore, pricing information is highly sensitive for many companies, and courts have been wary about imposing "on companies an affirmative duty to disclose *to competitors* sensitive pricing and marketing decisions." *In re Canandaigua Securities Litigation,* 944 F.Supp. 1202, 1211 (S.D.N.Y.1996) (emphasis in original). The law does not impose a requirement that "by revealing one fact about a prod-

uct, one must reveal all others that, too, would be interesting, market-wise, but ...only such others, if any, that are needed so that what was revealed would not be 'so incomplete as to mislead.' " *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir.1990) (*en banc* ) (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir.1968)) (*en banc*).

The plaintiffs have not pleaded with specificity the inflationary effect that any one of the allegedly underbid contracts can be said to have had on any single reporting period's financial results, *see, e.g., Greebel*, 194 F.3d at 204 (complaint must allege "such basic details as the approximate amount by which revenues and earnings were overstated"). Furthermore, S & W included in its 10–Ks cautionary language regarding the risks associated with fixed-price contracts as well as changes or developments that could impact backlog amounts, *see* Am. Compl. ¶ 164. I hold therefore that the plaintiffs have not shown, in opposing the present motions, that S & W had any duty to make further disclosures about its pricing strategies. " '[A] general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation [to satisfy Rule 9(b) ].' " *Gross v. Summa Four, Inc.*, 93 F.3d 987, 996 (1st Cir.1996) (quoting *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 362 n. 5 (1st Cir.1994)).

### 3. *S & W's Liquidity Problems*

█ The plaintiffs also allege that S & W's disclosures to its investors were rendered materially misleading because the defendants failed to disclose S & W's allegedly rapidly deteriorating liquidity situa-tion. Each of S & W's 10–Ks, 10–Qs, and quarterly earnings releases, as well as several press releases relating to S & W's credit facilities, its sale of stock to the S & W retirement plan,[8] and its sale of its corporate headquarters building in Boston, are alleged to have contained falsely optimistic statements about S & W's liquidity. S & W's cash problems are attributed by the plaintiffs to the alleged underbidding policy and the lack of payments from TPPI.

Certain of the liquidity-related disclosures alleged to have been false or misleading are management's assessment, contained in S & W's 1997 10–K, and its 10–Qs for the first three quarters of 1998, Am. Compl. ¶¶ 172, 192, 208, 223, of the capacity of S & W, going forward, to meet its anticipated cash needs. These statements are forward-looking predictions that S & W would have sufficient cash on hand when necessary. Moreover, each of the reports in question contains a section entitled "Forward–Looking Information" that provides "meaningful cautionary language." Therefore, all of these statements fall within the PSLRA's safe harbor, and the plaintiffs must therefore allege with particularity that the defendants actually knew the statements were false when made, rather than that they were merely reckless in making the predictions. *See* 15 U.S.C. § 78u–5(c)(1)(A)(i) and (B).

The other liquidity-related statements concerning present condition "were belated, inadequate and materially misleading," according to the plaintiffs. Am. Compl. ¶ 294. Smith and Langford, however, point to contemporaneous statements which they say appropriately revealed S & W's financial woes. They note that, begin-

---

**8.** The Amended Complaint alleges that the January 25, 2000 press release of S & W, announcing financial results for the quarter and year ended December 31, 1999 contained a quotation from Smith that S & W had improved its liquidity, by among other things, selling stock to its retirement plan. Am. Comp. ¶ 319.

ning with the 10–K for the fiscal year ended December 31, 1998, S & W, while continuing to make forward-looking predictions of its ability to meet its anticipated cash needs, also began to disclose that cash available under its banking facilities was almost fully drawn. *See id.* ¶ 242. The first quarter 1999 10–Q disclosed breaches by S & W of certain financial covenants contained in its credit agreements, *see id.* ¶ 264; the second quarter 10–Q disclosed the existence of a newly negotiated $230 million collateralized line of credit; *see id.* ¶ 278; and by October of 1999, S & W announced to investors that it would sell its corporate headquarters and cold storage business to, *inter alia,* "enhance liquidity," *id.* ¶ 283. Subsequent disclosures included revelations of increased past due obligations to vendors, delays in work by subcontractors who had not been paid, and an urgent need to find short-term financing to replace the credit facility, which matured in January of 2000, in order to continue normal operations. *See id.* ¶ 293. Smith and Langford argue that, given these disclosures and the press releases detailing the sale of S & W's headquarters and the sale of stock to the retirement plan—not to mention the grim liquidity picture painted in the 1999 10–K, which disclosed that S & W's direct borrowing lines of credit were fully drawn at year end, *see id.* ¶ 330—it was obvious to the market that S & W was experiencing increasingly serious cash flow problems. *See, e.g.,* Smith and Langford Joint Memorandum at 46 (noting that S & W's stock price dropped by 40% on October 27, 1999, when results for the third quarter of 1999 were released).

The plaintiffs contend in effect, however, that S & W had a duty to disclose its liquidity problems in the bleakest possible terms in order to make its disclosures complete and not misleading: "S & W was facing imminent collapse due to lack of working capital," Am Compl. ¶ 306, "S & W was out of cash, unable to pay its bills and unable to continue normal operations absent a sale," *id.* ¶ 330. Contrary to the proposition which the plaintiffs appear to advance, the securities laws do not impose on reporting companies an obligation to characterize their results—even if their results are very poor—in pejorative fashion. Such characterization has been held to add nothing to the total mix of information available: "When issuers accurately and completely disclose their operating expenses and net losses and accurately and completely list all of the factors for these expenses and losses, pejorative descriptions of these factors are not required." *Krim v. Coastal Physician Group, Inc.,* 81 F.Supp.2d 621, 629 (M.D.N.C.1998). Because, as discussed above, the plaintiffs have not met their burden of pleading with particularity that S & W's financial statements were fraudulently overstated, I conclude that S & W had no duty to expand upon or add negative characterizations to its disclosures about its current cash position as contained in its press releases and SEC reports beginning with the October 27, 1999 third quarter earnings release. Similarly, no liability can be premised on liquidity-related disclosures made before the summer of 1998, because plaintiffs do not plead that S & W was "starting to get strapped for cash" until that time.[9] Am. Compl. ¶¶ 70, 71.

---

**9.** Subsumed in this conclusion is the determination that plaintiffs have not adequately stated a claim with regard to the December 16, 1999 ESOP plan release. That claim is to the effect that the December 16, 1999 release was false or misleading because it was based on fraudulent financial statements. As noted earlier, S & W was under no duty to characterize its financial situation, however precarious, in a pejorative manner, and, as demonstrated above, the allegation that the financial statements upon which the fairness opinion

## E. Scienter of the Individual Defendants

█ Under section 10(b) and Rule 10b–5, once a plaintiff has met the initial pleading standards as they relate to the statements alleged to be false or misleading, a showing must be made that a defendant acted with scienter. *See Aldridge,* 284 F.3d at 82. Smith and Langford argue that the plaintiffs' general allegations of scienter are insufficient because they present no legally cognizable theory of motive and because they do not include specific contemporaneous facts that give rise to a strong inference of scienter. With one exception, I need not address the question of scienter, because I have concluded that the Amended Complaint insufficiently alleges false or misleading statements on the part of the defendants. The one exception concerns allegations of the defendants' failure to disclose liquidity problems in the 10–Q for the second quarter of 1999. Before turning to that question, however, I will address a dispute between the parties concerning the significance to the scienter element of allegations that Smith and Langford had both motive and opportunity to commit fraud.

### 1. Motive and Opportunity

Smith and Langford argue that the plaintiffs' claims against them are founded on the contention that these defendants were motivated to engage in the alleged fraudulent scheme in order to take advantage of change of control agreements that provided for lucrative lump-sum payments to them upon a change of control of S & W. Smith and Langford's Joint Memorandum at 9–10. The plaintiffs' theory, as characterized by Smith and Langford, was that Smith and Langford engaged in a "massive, multi-year fraud scheme" to make the Company attractive to a buyer in the short run and then position the Company for a sale which would trigger the change of control provisions of their employment contacts. *Id.*

Smith and Langford contend, however, that the change of control agreements did not provide them with compensation merely upon a change of control; instead, the agreements provided compensation only if Smith and Langford were fired without cause or constructively discharged. *Id.* Second, these defendants assert, the plaintiffs' theory of motive defies "common sense": a prospective buyer would have discovered the problems of S & W during the course of due diligence efforts and would have foregone any proposed purchase, leaving Smith and Langford without their alleged ill-gotten rewards when no change of control occurred. *Id.* at 11–12. Furthermore, say Smith and Langford, had they purposely caused S & W to enter into unprofitable contracts, they would have risked driving S & W into bankruptcy, putting in jeopardy any further compensation to themselves. *Id.* at 12.

As the defendants suggest, it seems unlikely that an executive would engage in a scheme that would succeed only if a careless buyer acquired S & W at precisely the right moment, when S & W had acquired enough loss contracts, but the losses had not yet begun to accumulate. Some courts have found instances of the coincidence of an unusual benefit to an executive and an alleged misstatement of earnings to be an indicator of motive and opportunity sufficient to provide a strong inference of scienter: In *Florida State Board of Admin. v. Green Tree Fin'l Corp.,* 270 F.3d 645 (8th Cir.2001), for example, the court

was predicated were falsely overstated have not been pleaded with the requisite particu- larity.

"conclude[d] that the magnitude of [an executive's] compensation package, together with the timing coincidence of an overstatement of earnings at just the right time to benefit [the executive], provides an unusual, heightened showing of motive to commit fraud." 270 F.3d at 661. Though the *Green Tree* decision rejected a district court order dismissing the case on the basis that the executive's scheme was ultimately unprofitable and the chance that it would have succeeded was unlikely from the start, *see id.* at 662, the facts in this case are not as clear-cut in the plaintiffs' favor. The executive in *Green Tree* was to have received bonus compensation keyed to his company's earnings at the end of a calendar year. By contrast, the plaintiffs here do not allege—nor can they allege—that either Smith or Langford could predict whether or when a bidder would emerge for S & W. Without the possibility of engineering a combination of earnings overstatements with a sale of S & W, the inference possible from plaintiffs' motive and opportunity pleading is not strong enough to meet the stringent First Circuit standard.

 Plausibility of the plaintiffs' theory aside, however, the actual terms of the control agreements, as the defendants argue, undermine the factual support for the alleged motive. *See* Smith and Langford Joint Appendix, Ex. 1 (Amended and Restated Change of Control Employment Agreement of H. Kerner Smith) & Ex. 2 (Change of Control Employment Agreement of Thomas L. Langford).[10] The agreements do not provide that Smith and Langford would receive payments merely upon a change of control. Instead, payments are predicated on their being terminated without "good reason" or upon their leaving S & W within the thirty-day period immediately following the first anniversary of the change of control. *See id.* ¶¶ 5(c), 6(a).

As to this latter point, it is inconsistent with the plaintiffs' theory to suppose that a purchaser would not recognize the fraud for a year after the acquisition. The significant gamble inherent in a scheme that would succeed only if a careless buyer acquired S & W at just the right moment is enough to negate any strong inference of scienter on the basis of motive and opportunity.

Smith and Langford have provided further support for their assertion that the scheme alleged by the plaintiffs would have run directly counter to their own economic self-interest by filing copies of SEC Forms 4 that show that they did not sell any, and in fact bought, S & W stock during the proposed class period. Smith and Langford's Appendix of Exhibits, Exs. 3–4.[11] Smith and Langford's Joint Memorandum of Law at 15. Though most cases in which courts have found motive and opportunity to be present involve the sale of stock by defendants at artificially inflated prices, Smith's and Langford's abstention from selling is not a completely sufficient means of rebutting plaintiffs' assertion. Rather, the important consideration, as articulated by the Second Circuit (which, in contrast to the stricter *Greebel* standard of this circuit,

---

**10.** I may consider these documents on a Rule 12(b)(6) motion to dismiss because they are documents referenced in the Amended Complaint. *See Shaw,* 82 F.3d at 1220.

**11.** There *is* authority in other circuits that would allow a district court to consider documents required to be filed, and actually filed, with the SEC on a motion to dismiss without converting the motion to one for summary judgment. *See, e.g., Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (judicial notice under Fed.R.Evid. 201(b)(2) is appropriate for required SEC reports). I take that approach here.

allows motive and opportunity *alone* to serve as an appropriate showing of scienter) is whether "defendants benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks,* 216 F.3d 300, 307–08 (2d Cir.2000). Here, plaintiffs have not alleged that either Smith or Langford actually received any concrete personal benefit under his change of control agreement.

### 2. *"Direct" and Circumstantial Evidence of Scienter*

█ The plaintiffs respond that the arguments of Smith and Langford are misplaced because the Amended Complaint does not rely solely on allegations of indirect evidence of scienter like motive and opportunity, but instead alleges direct evidence of actual and knowing participation by Smith and Langford in a fraudulent scheme. Thus, the plaintiffs say, fraudulent intent need not be inferred from indirect evidence, because the allegations of the Amended Complaint reveal direct evidence of fraudulent intent.[12] The plaintiffs' argument is in several parts. First, they argue that the allegations of the Amended Complaint are that Smith and Langford had actual knowledge that the TPPI project had been cancelled and nevertheless intentionally caused revenue from the project to continue to be recognized. Plaintiffs' Opposition to Smith and Langford Motion at 33. Second, the plaintiffs argue that the Amended Complaint alleges Smith and Langford knew that S & W was selling equipment obtained for TPPI for "pennies on the dollar," but insisted that S & W inform the investing public that it expected to recover its TPPI expenses. *Id.* at 33–34. Third, the plaintiffs say that the Amended Complaint alleges that Smith and Langford intentionally underbid projects at a loss. *Id.* at 34. Fourth, the plaintiffs point out that the Amended Complaint alleges that "Smith and Langford intentionally misled investors by claiming that the work in backlog was expected to be performed at 'improved margins,' when ... the backlog consisted of loss contracts as a direct result of the practice of underbidding," and that the defendants moreover failed to report losses on underbid contracts as soon as the losses were determined. *Id.* at 35. Fifth, the plaintiffs point to allegations in the Amended Complaint that Smith and Langford misrepresented S & W's financial situation by, among other things, misrepresenting the adequacy of S & W's cash resources to fund ordinary operations. *Id.* at 35–36. Sixth, the plaintiffs argue that the Amended Complaint alleges that Smith and Langford were aware of, but fraudulently kept secret, the vast difference between what was revealed in internal reports about S & W's financial condition and what was being said publicly about B & W's financial condition. *Id.*

These arguments of the plaintiffs for the most part are unavailing, because I have

---

**12.** It is unclear what point plaintiffs are trying to make by characterizing the evidence they have gathered as "direct" evidence that the defendants willfully participated in a scheme to defraud investors. Absent a signed confession, detailing each defendant's state of mind, it is difficult to imagine what form such "direct" evidence might take. Moreover, neither the PSLRA nor Rule 9(b) places circumstantial evidence any lower than direct evidence in the evidentiary hierarchy: the legal standard plaintiffs must meet is that they plead with specificity facts—of whatever type, including facts indicating motive and opportunity—that give rise to a strong inference of scienter. *See Greebel,* 194 F.3d at 196 ("The categorization of patterns of facts as acceptable or unacceptable to prove scienter or to prove fraud has never been the approach this circuit has taken to securities fraud.") I therefore examine each asserted piece of plaintiffs' "direct" evidence to determine whether the *Greebel* standard is met.

concluded, as discussed above, that the allegations of false or misleading statements made by Smith and Langford are insufficient under the standards of the PSLRA and Rule 9(b). The one exception to the foregoing concerns statements made about the company's liquidity in the second quarter of 1999.

*iii. Liquidity.* The plaintiffs claim to have direct evidence that Smith and Langford deliberately hid S & W's alleged cash flow problems from investors. *See* Am. Compl. ¶ 116. However, despite their investigative efforts—which appear from the Amended Complaint to have been extensive—the plaintiffs have not been able to plead with specificity facts tending to show that either Smith or Langford was made aware of the several alleged indicia of serious cash flow problems before the summer of 1999. *See id.* ¶ 79. For example, one of plaintiffs' sources stated that "some vendors and subcontractors ... called Smith directly to complain about not being paid," *id.* ¶ 85, but plaintiffs do not state who made the calls, when they took place, or how their source knew about the calls. For the other purported indicia of fraud, plaintiffs rely mainly on the generalized formulation that "S & W" knew of various incidents described by plaintiffs' sources. Such general allegations, or attempts to impute knowledge of middle managers to the chief executives of a corporation, are not sufficient: scienter is not sufficiently pleaded by alleging that "the defendants must have known the facts solely by virtue of their positions with the issuer of the securities." *Galileo*, 127 F.Supp.2d at 261 (citing *In re Peritus Software Services, Inc.*, 52 F.Supp.2d 211, 227–28 (D.Mass. 1999) and *Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 283 (D.Mass.1998)). Thus, particularly in light of the fact that many of the liquidity-related allegations are premised on forward-looking statements, which require that a defendant actually know that his or her statement is false when made, I hold that except as discussed below, these general assertions do not give rise to a strong inference of scienter on the part of Smith or Langford.

The most specific allegation that Smith and Langford knew about liquidity problems and knowingly or recklessly omitted to disclose them is set forth at ¶ 87. That paragraph states, in substance, that Smith, Langford and Jim Carroll, S & W's controller, received reports of overdue accounts payable on a monthly, weekly and then daily basis. The time frame during which these reports were prepared is not precisely specified, but the paragraph begins "At the same time...", which I take to be a reference to the immediately preceding paragraph, 86. Paragraph 86 deals with events alleged to have occurred in the summer of 1999.

A problem with the plaintiffs' reliance on these internal reports to establish that the defendants knowingly hid liquidity problems from investors is that the third quarter 10–Q for 1999, covering July, August and September, stated that "the amount of S & W's past due trade receivables had increased with certain of its vendors and subcontractors having delayed work to be performed by them." Id. ¶ 293. The third quarter 10–Q thus put investors on notice of S & W's liquidity problems. That the third quarter 10–Q does not address S & W's liquidity problems in starker terms is of no consequence, for as I have noted earlier, the defendants were under no obligation to characterize S & W's results in the worst possible terms.

The matter, however, does not end here. The plaintiffs have made sufficiently detailed allegations both of the inadequacy of S & W's disclosures in its 10–Q for the second quarter of 1999 and allegations sufficient to give rise to a strong inference of

scienter on the part of Smith and Langford with respect to the inadequacy of the second quarter 10–Q. Based on information from Martino, the former S & W senior accountant as source, the Amended Complaint alleges in paragraph 85 that vendors (including two vendors identified by name) called Smith directly about not being paid, and as noted earlier, in paragraphs 86 and 87, the plaintiffs allege that in the summer of 1999, S & W's accountants created a list of overdue accounts payable which were updated first on a monthly basis, then weekly and finally daily. The plaintiffs further allege in that paragraph that these reports were delivered to both Smith and Langford who decided which overdue bills should be paid and how much. Some accounts, the plaintiffs allege in paragraph 87, were 600 to 700 days overdue. The plaintiffs also allege that, notwithstanding their knowledge of the problems S & W was having paying its vendors and subcontractors, S & W issued a press release on July 26, 1999 in which Smith "and Langford touted S & W's financial situation" and predicted continued profitability throughout the remainder of 1999. Am. Compl. ¶¶ 94, 272. Nothing was said, according to the plaintiffs, about S & W's inability to pay vendors and subcontractors. ¶ 94. These allegations are sufficient both as allegations of misrepresentations and as allegations giving rise to a strong inference of scienter with respect to the July 26, 1999 release. To the extent that the allegations state set forth that Smith and Langford knew by the summer of 1999 that some accounts payable were 600 to 700 days overdue, they sufficiently allege recklessness in the misrepresentation of S & W's liquidity problems in the 10–Q for the second quarter of 1999 when, in the MD & A section of that form, "management" is said to believe that "it has on hand and access to sufficient funds to meet its anticipated operating … needs." Am. Comp. ¶ 278. Because the Amended Complaint specifies *who* received the reports, *what* was contained in them, and by *whom* the reports were prepared, with respect to the second quarter 10–Q, I conclude that the plaintiffs have alleged facts that support a strong inference that the defendants were reckless in not disclosing more detail about S & W's liquidity problems in that document. *See Silicon Graphics*, 183 F.3d at 985 (complaint should include details such as the sources of plaintiff's information with respect to and how plaintiff learned of internal reports, who drafted them, which officers received them, and sufficient allegations of contents.) I reach the same conclusion with respect to the July 26, 1999 press release.

## F. Claims Against PwC

 PwC has moved under Rule 12(b)(6) to dismiss both counts against it. "[A] complaint alleging securities fraud 'must specify (1) the statements that the plaintiff contends were fraudulent, (2) the identity of the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent.'" *Galileo*, 127 F.Supp.2d at 261 (quoting *Peritus*, 52 F.Supp.2d at 219). Therefore, in addressing the plaintiffs' claims against PwC, I must consider only those statements that PwC is alleged to have made. The plaintiffs allege that three statements by PwC are fraudulent: its audit opinions for fiscal years 1997, 1998, and 1999.

PwC is alleged to have known "or recklessly disregarded, that throughout the Class Period S & W fraudulently reported revenue and income, had a policy and practice of underbidding projects, failed to disclose the inevitable losses associated with its backlog figure, and also fraudulently reported its [S & W's] net assets." Am. Compl. ¶ 342.

The plaintiffs' allegations of fraudulent statements by PwC concern TPPI, underbidding and the resulting inflation of financial results. These allegations, in sum, are that PwC knew or was reckless in not knowing of the false or misleading statements of Smith and Langford during the Class Period, and that PwC is liable for allowing the fraud of Smith and Langford to infect PwC's audit opinions. As I have discussed above, however, the allegations concerning false or misleading statements by Smith and Langford with respect to TPPI and underbidding are insufficient under the PSLRA and Rule 9(b).

PwC contends as well that, even if the allegations in the Amended Complaint were sufficiently particularized, the Amended Complaint fails to raise a strong inference of PwC's scienter. In support of this argument, PwC makes three main points. First, PwC argues, the TPPI allegations raise at most a claim of a failure to investigate S & W's allegedly false allegations regarding that project. Second, the restatement of the 1999 financials weakens, rather than strengthens any inference of scienter. Third, PwC asserts that certain "red flags" identified by the plaintiffs are insufficient to raise a strong inference of scienter. *See* Memorandum of PricewaterhouseCoopers LLP in Support of its Motion to Dismiss the Consolidated and Amended Class Action Complaint ("PwC Memorandum") at 12.

The plaintiffs respond, as they did to Smith and Langford's motion, that PwC's arguments are misplaced, because the Amended Complaint does not rely on pleadings that create an inference of scienter, but rather pleads actual knowledge on the part of PwC. The plaintiff argue that the Amended Complaint adequately alleges PwC's scienter in four ways: (1) PwC had actual knowledge of material misstatements in S & W's financial statements; (2)

PwC's audits violated GAAS in so many ways that such audits amounted to no audit at all; (3) PwC ignored or recklessly disregarded many "red flags" regarding financial misconduct at S & W; and (4) PwC had the motive and opportunity to participate in and conceal the alleged fraud. Lead Plaintiffs' Brief in Opposition *to PricewaterhouseCoopers LLP's Motion to Dismiss the Consolidated and Amended Class Action Complaint* ("Plaintiffs' Opposition to PwC's Motion") at 5–6. While it may be unnecessary, given my discussion of the fraud claims against Smith and Langford, I will address each of these allegations in turn because of PwC's role as S & W's auditor, differing, as it does, from the respective roles of Smith and Langford as officers of the Company.

The plaintiffs first argue that the Amended Complaint demonstrates that PwC had actual knowledge of material misstatements in S & W's financial statements. The only source of such alleged misstatements that the plaintiffs cite is the "phantom revenue" from TPPI. *Id.* at 17–19. Just as the plaintiffs' TPPI allegations were insufficient to survive the particularity requirements of the PSLRA and Rule 9(b) as to Smith and Langford, so too are they insufficient to meet those requirements as to the claim asserted against PwC. The plaintiffs have failed to allege with sufficient particularity that S & W, much less PwC, knew that when the TPPI project was suspended, it would not be resumed. Moreover, the plaintiffs emphasize that the key element that rendered PwC's audit opinions misleading was "the fact that PwC knew this revenue [from the TPPI project] was being included in S & W's financial statements but that investors were not advised that it was included." *Id.* at 19. As discussed above, the revenues attributable to TPPI were readily calculable from the annual decrease in the amount of backlog relating to TPPI, and S

& W's disclosures regarding fixed-price contracts made it clear enough that the accrual method of accounting was used in preparing the financial statements.

The plaintiffs have thus not sufficiently pleaded the false or misleading element of the claim it asserts against PwC regarding TPPI. If plaintiffs cannot plead facts tending to show why a statement is false or misleading, it follows that they have not alleged facts giving rise to a strong inference of scienter with respect to PwC's decision to provide an unqualified audit when S & W recognized revenue from TPPI under the percentage of completion accounting method.

Another of the plaintiffs' arguments is that PwC performed audits that violated GAAS in so many respects that PwC "utterly failed in its role as an auditor." Am Compl. ¶ 357. This argument can be dealt with briefly. All of PwC's alleged GAAS violations relate to alleged violations of GAAP by S & W that I have determined above to be insufficient as allegations supporting a fraud claim against Smith and Langford. In addition, each of plaintiffs' claims of a GAAS violation is stated in completely conclusory terms. ("PWC failed to [examine corroborating evidence] because it failed to take any of the steps required by the AICPA Guide," Am. Compl. at ¶ 353; "PWC knew or recklessly disregarded the fact that the cost to complete estimates ... were overridden by senior management,"*id.* ¶ 354(d); "PWC ... fail[ed] to adequately plan its audit and properly supervise the work of assistants," *id.* ¶ 354(e).) These assertions—none of which is pleaded with the particularity required by the PSLRA and Rule 9(b)—are intended to serve as circumstantial evidence of PwC's scienter. " '[W]ithout additional allegations of particular facts and circumstances[,] violations of GAAP and GAAS generally do not give rise to an inference of scienter.' " *Raytheon,* 157 F.Supp.2d at 155 (quoting *Queen Uno Ltd. P'shp v. Coeur D'Alene Mines Corp.,* 2 F.Supp.2d 1345, 1361 (D.Colo.1998)).

The plaintiffs also argue that PwC recklessly disregarded many "red flags" that indicated that S & W's books did not accurately reflect its financial condition during the class period. *See* Am. Compl. ¶¶ 351–52. A plaintiff may demonstrate extreme recklessness amounting to scienter on the part of an independent accountant "by pleading with specificity that the auditor was aware of, but failed to investigate certain 'red flags' that plainly indicated misconduct was afoot." *Raytheon,* 157 F.Supp.2d at 154. Such "red flags," however, must be "something more than the accounting violation itself." *Id.* at 155. The Amended Complaint specifies eight alleged red flags, and mentions several others in general terms. *See* Am.Compl. ¶¶ 351–52. As PwC exhaustively demonstrates, none of these alleged red flags is sufficient to create a strong inference of scienter. *See* PwC Memorandum 20–23.

First, the plaintiffs fail to allege, in other than conclusory terms, that PwC was even aware of some of the alleged red flags. *See, e.g.,* Am. Compl. ¶ 351(1) ("PWC knew that S & W's explanations for these charges [relating to cost overruns] were false and misleading"). Others consist of allegations that I have held above to be insufficient allegations of false or misleading statements on the part of Smith and Langford. *See, e.g., id.* ¶ 351(4) ("[W]hen S & W announced that it believed the [TPPI] project was likely to resume, it had no basis for this claim...."). The assertion that PwC's auditors "were regularly present at S & W's corporate headquarters throughout the year and had continual access to and knowledge of S & W's private and confidential corporate financial and business in-

formation," Am. Compl. ¶ 341, is not enough to establish scienter. When faced with a nearly identical recital in a securities fraud complaint, another court wrote that "[t]his statement could be ·made in relation to the auditor of every corporation. If it were sufficient to plead scienter, it might make every auditor liable in cases of securities fraud." *Kennilworth Partners L.P. v. Cendant Corp.*, 59 F.Supp.2d 417, 429 (D.N.J.1999).

Still other "red flags" were disclosed by PwC and accounted for in S & W's financial statements. *See, e.g., id.* ¶ 351(5) (cost overruns in 1999–2000). Others are limited to the latter portion of the Class Period and are therefore irrelevant to the 1997 and, in some cases, 1998 audit reports. *See* PwC Memorandum at 21–22. The plaintiffs expand the red flags to twenty-plus in their Opposition to the Motion to Dismiss; however, each of the alleged red flags in the expanded list suffers from the same deficiencies as those specifically identified in the Amended Complaint. *See* PricewaterhouseCoopers LLP's Reply to Lead Plaintiffs' Opposition to the Motion to Dismiss at table 1.

The plaintiffs' motive and opportunity allegations are also insufficient. The plaintiffs' theory of motive is that PwC, because of its longstanding relationship with S & W, would cooperate in the fraud to "continue to receive the millions of dollars in accounting and consulting fees paid by S & W." Am. Compl. ¶ 361. While it is clearly not impossible that an auditor would be sufficiently motivated to commit fraud by such considerations, a longstanding business relationship, *in se*, is not sufficient to demonstrate scienter. *See, e.g., Reiger v. Altris Software, Inc.*, 1999 WL 540893 *3 (S.D.Cal.1999) (citing cases). More particularized allegations are required. Likewise, the assertion that PwC's motive lay in its desire to cover up its own "reckless and unprofessional per-formance", Am. Compl. ¶ 361, is not supported by anything more than plaintiffs' speculation.

Both because the plaintiffs have not alleged with sufficient particularity that PwC made any false or misleading statements and because no strong inference of PwC's scienter arises from the allegations of the Amended Complaint, I GRANT PwC's motion to dismiss the claims asserted against it in count one.

### G. *Section 20(a) Claims*

Section 20(a) creates derivative liability for persons who "control" others who are primarily liable under the Exchange Act. *See* 15 U.S.C. § 78t(a):

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

The plaintiffs allege that "[a]s controlling persons within the Company, [Smith and Langford] are liable pursuant to Section 20(a) ... for S & W's primary violation of section 10(b) and Rule 10b–5." Am. Compl. ¶ 395.

In order to survive a motion to dismiss, plaintiffs must allege sufficiently pleaded primary violations of section 10(b) and Rule 10b–5. I have determined that adequately pleaded allegations exist regarding whether S & W was reckless in failing to disclose its liquidity problems in the second quarter of 1999 and in the July 26, 1999 press release. The plaintiffs have also alleged the second element of·a section 20(a) claim—that Smith and Langford each had the "the power to influence and control and did influence and control ... the decision-making of the Company."

Am. Compl. ¶ 393. Less clear is whether a third element—culpable participation of the alleged controlling person—is required in this Circuit. *See In re Lernout & Hauspie Securities Litig.*, 208 F.Supp.2d 74, 90–91 (D.Mass.2002) (discussing lack of clear First Circuit precedent). As in *Lernout & Hauspie*, however, I find that if culpable participation is required, the Amended Complaint sufficiently alleges participation by Smith and Langford in their review of accounts payable reports during the summer of 1999. Therefore, I DENY the motion of Smith and Langford to dismiss the claims against them in count two to the extent that such claims relate to the 10–Q for the second quarter 1999 and the July 26, 1999 press release. As to all other allegedly false or misleading statements, which I have found not to have been sufficiently particularized, Smith and Langford's motion to dismiss is GRANTED.

### H. *Section 18 Claims*

 Section 18 creates liability for one who makes materially false or misleading statements in any document filed with the SEC. No showing of scienter on the part of the person making the statement is required. 15 U.S.C. § 78r(a). SEC regulations limit the types of filings to which section 18 liability is applicable: "[T]he financial information required by Part I of Form 10–Q and Form 10–QSB, shall not be deemed to be 'filed' for the purpose of section 18 of the Act." 17 CFR § 240.13a–13(d). *Cf. In re Digi International Securities Litigation*, 6 F.Supp.2d 1089, 1104 (D.Minn.1998). Thus, plaintiffs may not proceed with a section 18 claim based on any disclosures contained in S & W's quarterly reports on Form 10–Q.

Pleadings under section 18 must satisfy the same particularity requirements of Fed.R.Civ.P. 9(b) as those under section 10(b). *See Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F.Supp. 49, 56–57 (D.Mass.1995). In addition, "a plaintiff must specifically allege that he actually read a copy of the document filed with the SEC ... *and was induced to act upon specific misrepresentations in the document.*" *Id.* at 56 (citing cases) (emphasis added).[13] Thus no "constructive" or "fraud on the market" theory of reliance suffices under section 18. The Amended Complaint specifies that the named plaintiffs read and relied upon each of S & W's reports filed during the Class Period, Am. Compl. ¶ 398, and were damaged by the drop in S & W's stock price that occurred at the end of the class period, *id.* ¶ 404. No assertion is made as to the reliance on documents filed with the SEC for section 18 purposes by other members of the proposed class.

Accepting the well-pleaded assertions as true, it would be appropriate to permit the lead plaintiffs—and only the lead plaintiffs, at this stage—to proceed with their section 18 claims as they relate to any allegedly false or misleading statements contained in the 10–Ks had the plaintiffs' allegations satisfied the pleading requirements of the PSLRA and Rule 9(b). The problem is, however, that the plaintiffs have not pleaded with sufficient particularity that the 10–K's contained false or misleading statements. Therefore, I GRANT the motions of PwC and of Smith and Langford to dismiss the claims asserted against them in count three.

### IV. Conclusion

For the reasons discussed above, the motions of defendant Pricewaterhouse

---

**13.** Although I need not address the issue here, I note that this reliance requirement raises questions regarding the appropriateness of maintaining section 18 claims in a class ac-

tion. *See, e.g., Beebe v. Pacific Realty Trust,* 99 F.R.D. 60, 70 (D.Or.1983); *Elster v. Alexander,* 76 F.R.D. 440, 442 (N.D.Ga.1977).

Coopers LLP are GRANTED as to all counts against them, and the motions of defendants H. Kerner Smith and Thomas L. Langford are GRANTED with respect to: count three (violations of section 18 of the Exchange Act) and those portions of count one (violations of section 10(b) of the Exchange Act and Rule 10b–5) that pertain to false or misleading statements alleged to have been contained in any document or statement other than the report on Form 10–Q for the fiscal quarter ending June 30, 1999 and the related earnings release issued on July 26, 1999 (the "Q2 1999 Statements"). The motions of Smith and Langford are DENIED insofar as they relate to false or misleading statements alleged in counts one and three to have been contained in the Q2 1999 Statements.

SO ORDERED.